Amy L. Bentley, M.D.
Chilton Family Medicine, P.C.
107 Health Center Drive
Clanton, AL 35045

August 18, 2006

R. Thomas Warburton, Esq.
Bradley Arant Rose & White LLP
1819 Fifth Avenue North
Birmingham, AL 35203

   Re: <u>Courtney Boyd vs. Frederick Bates,</u>
      U.S. District Court, N.D. Alabama; 7:03-cv-1780-TMP

Dear Mr. Warburton:

  On August 11, 2006, I performed a medical examination of Courtney Boyd, who I understand is the plaintiff in the above-referenced case. On August 11th, I also engaged in an initial review of what I understand is the medical file for Mr. Boyd maintained by the Alabama Department of Corrections. I intend to perform a more thorough review of this file upon receipt of it from you in full at a future date. My understanding is that these photocopies were requested on August 11th, and that I will receive them shortly. In forming my opinions, I have carefully considered Mr. Boyd's account of the injuries he sustained on June 30, 2003, as well as a multitude of other factors including the report of past medical history received from Mr. Boyd, his current physical condition and limitations, his self-reported pain, and his physical findings. I submit this letter as a summary report of the opinions, findings, and conclusions generated by my examination of Mr. Boyd and his medical records.

<u>Background</u>

  Mr. Boyd reports that prior to incarceration, he was in good health and with the exception of an asymptomatic "heart condition" (most likely a murmur), he felt well on a daily basis. To summarize his words, "he had never really been to a doctor except to get school shots." Prior to June 30, 2003, I understand that Mr. Boyd experienced continuing heart issues, and random accidental injuries in which no truly lasting injury to Mr. Boyd's back or his general motor function were reported.

  The injury as it was explained to me took place on June 30, 2003, in a dormitory area of Bibb County Correctional Facility. My understanding is that



this is not a high security facility but a lower level security facility where men live in a common area as opposed to individual cells. An inspection or search was occurring. Mr. Boyd and the others were ordered to their beds. He complied with that order and assumed the standard position of face down with his hands behind his head and his ankles crossed on the top bunk of his bed. Apparently, a guard – for what reason I am unclear – grabbed Mr. Boyd by his shirt collar and belt in the back. The man is reportedly at least 6'0" tall. He lifted him a few inches off his bunk and after moving back to clear the bunk, thrust him to the ground. Mr. Boyd made it very clear to me that he was not merely released to fall but was hurled five feet down to the floor with force. At that time, he sustained injuries to his torso, chin and at least one elbow. The scars on his elbow and chin remain. As he lay on the floor, the assailant began stomping his neck and torso posteriorly and inflicting crush injuries upon him. Shortly thereafter other guards joined in striking Mr. Boyd. His hands protected his head and shielded his skull from the blows. He repeated to me that his middle to lower back took the brunt of the beating. Delicate muscle tissue that lines the spine would have been crushed between the assailant's soles and bone below. This clearly explains to me the mechanism of injury that led to findings of long-standing muscle injury I observed.

After the stomping, Mr. Boyd was instructed to stand and he tried to comply quickly, coming first to his hands and knees. When he got to his feet, he began walking to the wall as commanded. He then was punched in the left eye by the attacker that originally began the assault. He saw the punch being thrown as the guard drew back to hit him. He was able to lean back in an attempt to dodge the blow. Still, the punch landed with enough force to knock him to the ground. His pants were then stripped off and he got to his feet. He finally arrived at the wall and was reportedly degradingly fondled on his buttocks.

The patient reports that after the incident occurring on June 30, 2003, he had difficulty with daily activities such as bending to drink from a water fountain, finding a comfortable sleeping position, and being on his feet for extended periods of time, to name a few of the activities Mr. Boyd and I discussed.

### Medical Examination

It is, of course, most notable that the physical exam findings do support the patient's claims of injury. On examination, Mr. Boyd is a withdrawn African-American male that appears his stated age of twenty-four years. He ambulates normally with normal arm swing and gait. He appears not to be in constant distress and was cooperative during my examination and interview. Further points of the examination are normal with respect to his demeanor, and Mr.

Boyd's cognition appears appropriate for his level of education. He verbalizes understanding of the questions he is being asked. Psychologically, the patient appears embarrassed, verging on humiliated, as indicated by loss of eye contact and downcast gaze when reporting the details of the June 30, 2003, incident, as they specifically relate to a guard stripping him down to his undergarments and fondling his buttocks with a club while making inappropriate sexual remarks. The most notable abnormalities found on my examination were as follows:

> There is significant muscle spasm in the paraspinous or erector spinae muscles from the lower thoracic through the low lumbar region of the spine.
>
> Bilateral lumbar pain reported 6-7 (on a scale of 1 to 10) with resisted flexion and extension of the knees.
>
> Pain reported at only 20° flexion at the waist with a resulting severe limitation of mobility in the spine. Limited torsion capability at the waist due to decrease range of motion in spine for twisting.

### Conclusions

I often ask patients to reproduce maneuvers that reportedly cause pain, but do so in a way that they do not realize I am examining their response. For example, in Mr. Boyd's case, there was severe limitation in spine motion. He was only able to flex at the waist to twenty degrees (20°). In an attempt to verify this disability, I created a situation in which he was called upon to bend over when that was not the skill/ability being tested. To such end, I asked him to remove his socks and shoes so I could check his feet. In a manner consistent with patients having limited range of motion in their spine, he squatted to remove his shoes and socks. This is the type of internal validity of an examination that must exist for me to consider a patient's complaints and the physical findings of the examination reliable.

Also of note is Mr. Boyd's pain scale use. He volunteered the rating of 6-7 out of 10 without my prompting. Many patients automatically rate their pain as 10 out of 10 but do not have other evidence of that level of pain such as elevated heart rate and blood pressure. 6-7 out of 10 pain does occur with the muscle and back injuries seen in Mr. Boyd and is associated with routine daily activities. His story is not exaggerated based on his tendency to accurately report pain.

3

In summary, my examination of Mr. Boyd and the other items noted above causes me to conclude that Mr. Boyd's current physical condition is consistent with the reported mechanism of injury. Mr. Boyd's physical condition is similar to many other blunt force and contusion-type injuries to the trunk that I have seen in my practice. The type of physical insult described results in the type of injuries suffered, pain described, and disability and incapacitation observed in Mr. Boyd. The effect on his state of health is a direct impact of the loss of wellness in this previously healthy young person.

Sadly, Mr. Boyd is not a person with unlimited employment prospects. He is not a college graduate suited for office work. He has minimal education compared to most people in his generation. He is probably intellectually suited for a trade job. Construction, maintenance, or factory work would be a suitable job for his educational background. They are all fine jobs, but not for Mr. Boyd. Limitations in his physical abilities severely restrict his ability to pursue a job on release. He is not capable of any bending, twisting, kneeling, above the head or lifting work whatsoever. He does not have a medical problem correctable by surgery. Chronic muscle spasm responds somewhat to medicines and therapy. Therapy is obviously not within his reach at present. With the severe limitations in his future ability to perform a job noted above, Mr. Boyd has very minimal rehabilitation potential. Courtney Boyd has been given a life-long disability.

### Testimonial Aids and Fees

In explaining my conclusions and opinion, I intend to use a spine model and medical graphics, which I believe may enhance understanding of my anticipated testimony as to the dynamics of motion and weight-bearing in the human body. The purpose of these visual aides would be to show aberrant postures resulting from muscle spasm as well as to illustrate the large muscle groups referred to in my exam.

In this case, I am charging my practice's customary fees for "non-practice" services:

- Travel - $100.00 per hour, plus standard mileage
- Patient examination - $100.00 per hour
- Testimony - $250.00 per hour
- Preparation of reports/document review - $100.00 per hour
- Expenses such as facsimiles, photocopying, equipment, anatomical models at actual cost only.

My conclusions and opinions are based upon my education, training, experience, my standard medical reference materials, my medical examination of Mr. Boyd, and the medical history information made available to me at the time

of such examination. Should additional facts be made available, my opinions may be modified or additional opinions offered. If you have any questions or need additional information regarding this report, please contact me.

Sincerely,

*[signature]* A. Bentley, M.D.

Amy L. Bentley, M.D.

# Amy Lee Bentley, M.D.
107 Health Center Drive
Clanton, Alabama 35045
(205) 280-1010

| | |
|---|---|
| Education: | University of Alabama at Birmingham<br>Birmingham, Alabama<br>August 1991-August 1996<br>Bachelor of Science - Biology |
| | University of Alabama School of Medicine<br>Birmingham, Alabama<br>July 1995 - June 1999<br>Medical Doctor – June 6, 1999 |
| Residency: | Internal Medicine Residency<br>Baptist Health System, Inc.<br>Birmingham, Alabama<br>July 1, 1999 – June 30, 2002 |
| Licensure: | State of Alabama, February 2001 |
| Membership: | American College of Physicians, Member<br>Jefferson County Medical Society<br>Medical Association State of Alabama<br>American Board Internal Medicine 2002, Board Certified |
| Boards & Committees: | AMA - 1999 until present<br>MASA - 1999 until present<br>Credentialing committee at Chilton Medical Center |
| Research: | May 1997 – August 1997<br>UAB Department of Radiology, Division of<br>Ultrasound Research Assistant. Carotid Artery Stenosis:<br>Comparison of Ultrasound vs. Angiography in diagnosis |
| | June 1996 – September 1996<br>Greater Birmingham Cerebral Palsy Center<br>Data Collection - children with spinal bifida and cerebral palsy |


DEFENDANT'S EXHIBIT B

  May 1996 – August 1996
UAB Department of Radiology, Division of
Ultrasound Research Assistant. Renal Artery Stenosis and
Ultrasound criteria for patient Stratification into disease class

May 1996 – august 1997
UAB Department of Radiology, Division of
Ultrasound Research Assistant. Phase II and III trails
Of an ultrasound contrast agent for peripheral vascular studies

**Volunteer Experience:**

October 1997 – December 1997
Birmingham Fire & Rescue Service
Project Organizer

July 1997 – August 1997
Chilton County Medical Society
Student doctor examiner

May 1996 – October 1998
City of Thorsby
Community Programs

May 1996 – September 1994
Juvenile Diabetes/Diabetes Mellitus 1992
Project Coordinator

January 2002 – present
Chilton County Humane Society

August 2003 – May 2006
Chilton County School District
Team Physician

**Legal Testimony:**  Talmadge Bradford vs. JR's Painting & Decorating 2005
Clarice Moss vs. Delta Airlines 2005

**Occupational Medicine:**
Account Director for CRH North American, International Paper, KMA, Merchant Company and Southeastern Anodizing



# EMERGENCY

| | |
|---|---|
| ADMISSION DATE: 7/24/07 | TIME: 12:05 PM |
| ORIGINATING FACILITY: Bts | ☐ SIR ☐ PDL ☐ ESCAPEE |
| ☐ SICK CALL ☐ EMERGENCY ☐ OUTPATIENT | |
| ALLERGIES: NKA | |
| CONDITION ON ADMISSION: ☐ GOOD ☐ FAIR ☐ POOR ☐ SHOCK ☐ HEMORRHAGE ☐ COMA | |
| VITAL SIGNS: TEMP 98° ORAL/RECTAL | RESP 18  02 SAT 98  PULSE 81  B/P 98/60 |

**NATURE OF INJURY OR ILLNESS**

S - Muscle spasm in back
legs, left hand - wet to get
off bed wet to floor
O - Brought over on stretcher
Escorted by Lt. Lee and officer
Scary - Alert - oriented x 3
Able to move legs. No bruises or
marks on body - Medicine given
as ordered.

**PHYSICAL EXAMINATION**

A - Alt. comfort of back pain
P - Give medication as ordered by Dr. Daw
Left ambulatory escorted by officer Catry
back to dorm
E - Instructed to sign up for S/C
when he gets back to dorm

**ORDERS / MEDICATIONS / IV FLUIDS**

| | TIME | BY |
|---|---|---|
| Naproxen 500mg P.O. x 1 | 12 PM | |
| Flexeril 10mg P.O. x 1 | 12 PM | |

**DIAGNOSIS**

FOR PROFESSIONAL USE ONLY
CONFIDENTIAL RECORD
NOT TO BE PHOTOCOPIED

**INSTRUCTIONS TO PATIENT**

| | |
|---|---|
| DISCHARGE DATE: 7/24/07 | TIME: 12:20 PM |
| RELEASE / TRANSFERRED TO: ☑ DOC ☐ AMBULANCE  7-24-07 | CONDITION ON DISCHARGE: ☑ SATISFACTORY ☐ FAIR ☐ POOR ☐ CRITICAL |
| NURSE'S SIGNATURE | DATE: 7-24-07 |
| PHYSICIAN'S SIGNATURE | DATE: 7/24/07 |
| CONSULTATION | |

**INMATE NAME (LAST, FIRST, MIDDLE):** Boyd, Courtny

| DOC# | DOB | R/S | FAC. |
|---|---|---|---|
| 228521 | 12-1-87 | BM | Bts |

PHS-MD-70007    (White - Record Copy, Yellow - Pharmacy Copy)

PHS015

Exhibit B-2



## PRISON HEALTH SERVICES, INC.
## SICK CALL REQUEST

Print Name: Courtney Boyd   Date of Request: 3-26-07
ID # 208921   Date of Birth: 12-11-81   Location: B-1-40
Nature of problem or request: I need to see the Doctor about my back going out and I could move for 48 hours; I wet myself on the floor because I could not move. Also I sleeping on the floor, and that is hurting my back worse. So please call me over; I told all three shifts this problem.

Signature: Cordy Boyd

**DO NOT WRITE BELOW THIS LINE**

Date: 3/27/07
Time: 9:40 AM/PM
Allergies: _____

RECEIVED
Date: 3-27-07
Time: 3:15 A.M.
Receiving Nurse Initials: ___

(S)ubjective: See nrt took dated 3/27/07

(O)bjective (V/S): T:____ P:____ R:____ BP:____ WT:____

FOR PROFESSIONAL USE ONLY
CONFIDENTIAL RECORD
NOT TO BE PHOTO COPIED

(A)ssessment:                    20891

(P)lan:

Refer to: MD/PA   Mental Health   Dental   Daily Treatment   Return to Clinic PRN
CIRCLE ONE
Check One: ROUTINE ( )   EMERGENCY ( )
  If Emergency was PHS supervisor notified:   Yes ( )   No ( )
  Was MD/PA on call notified:   Yes ( )   No ( )

_____
SIGNATURE AND TITLE

WHITE:   INMATES MEDICAL FILE
YELLOW: INMATE RETAINS COPY AFTER NURSE INITIALS RECEIPT

PHS061

Exhib4 B-2